IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § § | **CASE NO. 20-31585-11** |
| **PEARL RESOURCES LLC** | § § | |
| | § | **CASE NO. 20-31586-11** |
| **PEARL RESOURCES OPERATING CO. LLC** | § § § | **CHAPTER 11** |
| Debtors | § § § | Joint Administered Under Case No. 20-31585-11 Judge Eduardo V. Rodriguez |

_____

| | | |
|---|---|---|
| **GEORGE P. BUSH, COMMISSIONER, THE TEXAS GENERAL LAND OFFICE,** Plaintiff | § § § § § | **Adv. Pro. No. 20-3169** |
| **V.** | § § | |
| **PEARL RESOURCES LLC,** Defendant | § § | |

**DEFENDANT, PEARL RESOURCES LLC'S ORIGINAL
ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM**

**TO THE HONORABLE EDUARDO V. RODRIGUEZ,
UNITED STATES BANKRUPTCY JUDGE**:

Pearl Resources LLC (hereinafter "Pearl" or "Defendant") files this Answer, Affirmative Defense and Counterclaim to the Complaint for Declaratory Judgment (hereinafter the "Complaint") filed by George P. Bush, Commissioner, the Texas General Land Office (hereinafter the "GLO" or "State") and respectfully states as follows.

**I.
ANSWER**

1. Pearl admits the allegations of jurisdiction and venue in Paragraphs 1 and 2 of the Complaint.

1

2. Pearl admits the parties are correctly identified in Paragraphs 3 and 4 of the Complaint.

3. Pearl admits the allegations by the GLO in Paragraphs 5 and 6, except for the second to the last sentence of Paragraph 6. Pearl alleges there are several different "standard" RAL lease forms, and that many RAL leases approved by the State include terms that are not part of the standard forms.

4. Pearl admits the State Leases contain the provisions as alleged by the GLO in Paragraphs 7 and 8 of the Complaint and that one of the State Leases is attached as Exhibit A to the Complaint.

5. Pearl admits that 31 T.A.C. §9.43(e) is correctly quoted in Paragraph 9 of the Complaint. However, Pearl points out that "drilling operation" is defined in 31 T.A.C.§9.31(b) (2) and "consists of all activities designed and conducted in an effort to obtain initial production from a well." That rule goes on to state "as long as the actual spud date occurs within a reasonable time, a drilling operation begins when a RRC drilling permit has been obtained and preliminary work, such as grading roads, moving equipment, digging pits or staking locations, has started." Pearl also points out that §9.43(e) includes the language "and the lessee has not otherwise maintained the lease," and as more fully described below that is what happened in this case due to denial of access.

6. Pearl admits that some, but not all of the State Leases are more than two years past the original primary terms as stated in such State Leases, but denies that the primary terms of such State Leases, at least as to the S/2 of Section 22, have actually expired as alleged in Paragraph 10 of the Complaint. Pearl was denied access to the S/2 of Section 22 for a period of four years beginning on or about March 1, 2014 during the primary term of such State Leases and lasting until February 28, 2018. Accordingly, the running of the primary terms as to such State Leases

was suspended during the time period Pearl was denied access.[1] Pearl admits that it received the letters attached as Exhibits B and C that are referenced in Paragraph 10 but denies all the other allegations in Paragraph 10.

7. Pearl admits it did not provide the partial releases referenced in Paragraph 11 of the Complaint, and admits the partial releases were requested by the GLO in its letters attached as Exhibits B and C to the Complaint. However, Pearl alleges that it was justified in not providing the requested partial releases because all such State Leases, at least as to the S/2 of Section 22, had not terminated.

8. Pearl admits the GLO filed the Designation of Terminated Acreage and Depths attached as Exhibit D as alleged in Paragraph 12 of the Complaint.

9. Pearls admits the allegations in Paragraphs 13 through 17 of the Complaint and admits that Bankruptcy Code Section 541(a)(1) contains the language quoted in Paragraph 18 of the Complaint.

10. Pearl admits that it is taking the position that the State Leases, at least as to the S/2 of Section 20 and the S/2 of Section 22 are property in Pearl's bankruptcy estate as alleged in Paragraph 19 of the Complaint.

11. Pearl admits that the State Leases as to the N/2 of Section 20 have terminated but denies the other allegations in Paragraph 20 of the Complaint.

12. Pearl denies that the GLO is entitled to declaratory relief as requested in Paragraphs 20 and 21 of the Complaint.

13. Pearl can neither admit nor deny the reservation of alternative claims as pled in Paragraph 22 of the Complaint.

---

[1] The GLO admits the State Leases as to the S/2 of Section 20 are held by production.

## II.
## AFFIRMATIVE DEFENSES

14. Pearl alleges the affirmative defense of impracticability on the basis that Pearl was denied access to and therefore prevented from timely conducting operations on the S/2 of Section 22 by the actions of one of the State's agents and his son, and by the actions of third parties.

15. Pearl alleges the affirmative defense of repudiation. On December 20, 2019 the GLO unequivocally challenged Pearl's title to the State Leases as to all acreage other than the S/2 of Section 20.

## III.
## COUNTERCLAIMS

### A. Background and Facts.

16. The State Leases at issue in this adversary proceeding are dozens of oil and gas leases executed by the state's agents, each of whom owned an undivided interest in the surface estate of Section 20 and/or the S/2 of Section 22.[2] Some of the earliest State Leases were taken in September and October of 2011 with five-year primary terms. Pearl acquired those State Leases in 2012. Some of the State Leases were taken in 2014 with five-year primary terms, and some were taken in 2016 with one-year primary terms.[3]

17. Section 20 and Section 22 are not contiguous, and neither section has access to a public road. The nearest public road to Section 20 is FM 1776 about 1.5 miles to the west. The nearest public roads to Section 22 are FM 1450 about 4 miles to the south and FM 1776 about 2.5 miles to the west.

---

[2] Section 20, Blk. 8, H&GN Ry Co. Survey, A-5206 and the S/2 of Section 22, Blk. 8, H&GN Ry Co. Survey, A-5208.
[3] Pearl also acquired and owns undivided interest private leases covering Section 44, the E/2 Section 40, the W/2 Section 41 and Section 42 which lie to the east and south of the two sections covered by the State Leases.

18. In early 2013 Pearl contracted with Total Field Services to construct a road from Pearl's well in Section 44[4] into Section 22. Gaynor Brandenburg controlled the surface of Section 44, and Pearl paid him for the right to construct and use that road. During 2013 and into 2014 Pearl was able access Section 22 using this route. During that time frame Pearl drilled a water well and built and lined a 40,000 bbl. frac pit on Section 22.

19. On February 27, 2014, Pearl installed a new lock on the gate going into Section 22 in anticipation of starting operations on its staked Garnet State No. 1 well. However, on March 1, 2014 Gaynor Brandenburg placed an 18-wheel trailer rig across the road on the east side of the gate going into Section 22, blocking Pearl from using that road to access Section 22.

20. After Gaynor Brandenburg blocked Pearl's access to Section 22 on the road coming from Pearl's well on Section 44, Pearl could only access Section 22 from the west, following a pipeline right-of-way that Pearl had verbal permission to use. However, the condition of that right-of-way was such that it could not be used by any large or heavy vehicles and certainly not a drilling rig.

21. Until August of 2016 Pearl was accessing Section 20 using a combination of an existing oil field lease road along the south line and east line of Section 13 that then went east into Section 24 and then using pipeline rights-of-way to get to the lease on Section 20. Pearl had verbal permission to use the lease roads and pipeline rights-of-way but could not use that access route for large or heavy vehicles, nor a drilling rig.

22. In June and July of 2016 Pearl's surveyor, John F. Watson & Company, completed the surveys of the locations for the Garnet State Well Nos. 1 and 2 on Section 22, and for the Garnet State Well No. 3 in Section 20.

---

[4] Pearl re-entered and re-completed the Brandenburg #1 well and used the existing historical lease road under contract with Trees Ranch going north from FM 1450 to access that well on Section 44.

23. In July 2016 Pearl attempted to negotiate an easement with the Trees Ranch from FM 1776 along the north lines of Sections 14, 24 and 21 that would provide Pearl legal access to both Sections 20 and 22, and the ability to bring in heavy equipment and a drilling rig to both sections. On August 1, 2016 Parsley advised Pearl it had acquired the surface from the Trees Ranch, and soon thereafter on August 5, 2016 rejected Pearl's proposed access route.

24. Later in August 2016 Pearl was able to negotiate and obtain easements from Braden Bros. and from Walter Daggett III, et al that got Pearl access to Section 20, along the north and east lines of Section 13, and along the north line of Section 19.5. But that did not get Pearl access to Section 22.

25. While Pearl was in the process of negotiating the easements from Braden Bros. and Walter Daggett III to get to Section 20, Pearl was also trying to negotiate an access easement across Section 21 to get to Section 22. Drew Reid, an employee of the GLO who was in constant contact with Pearl in August of 2016 about its attempts to obtain access, had advised Pearl that if the owners of Section 21 refused to negotiate an easement, Pearl could use the power of eminent domain under Section 11.079 of the Texas Natural Resources Code to get the access Pearl needed to Section 22.

26. So, in August 2016 Pearl attempted to negotiate with the owners of Section 21 to obtain an easement across that section to access Section 22. One of the owners of Section 22, Roger Harrison (also an agent or representative for Parsley), refused to negotiate any easement across Section 21. Pearl advised Drew Reid on August 24, 2016 that it was in the process of making offers as a predicate to filing the condemnation action, and that due to Roger Harrison's desire to prevent Pearl access, it was likely that the formal condemnation process would be likely.[5]

---

[5] See email chain between Pearl and Drew Reid attached as Exhibit A.

27. In August 2016 Pearl began in earnest to build out the road along the easements Pearl had obtained from Braden Bros. and Daggett. In addition, during August and September 2016 Pearl surveyed the Garnet State No. 4 well, and began building the road, the location and the reserve and frac pits for the Garnet State No. 4 well on Section 20.

28. However, that work came to a halt on August 29, 2016 when Ronnie Brandenburg (Gaynor Brandenburg's father), who controlled the surface of Section 20, blocked Pearl's access. Pearl obtained a temporary injunction against Ronnie Brandenburg on September 9, 2016 and was then able to access Section 20 again.

29. However, Pearl was still facing a protracted eminent domain proceeding to get access to Section 22 from Section 20 across Section 21. So, in an effort to avoid having a long protracted condemnation proceeding, Pearl filed a lawsuit against Gaynor Brandenburg on September 23, 2016 to have Gaynor Brandenburg's 18-wheel trailer rig removed from the road coming from the east that blocked Pearl's gate on the east side of Section 22. A temporary injunction hearing was held on October 7, 2016, but the court didn't grant an injunction, and Gaynor's trailer rig remained in place blocking Pearl's access to Section 22 from the east. Pearl was left with no other recourse than to pursue the condemnation action to get an access easement across Section 21.

30. On March 1, 2017 Pearl filed its Original Petition and Statement for Condemnation for an access road across Section 21. Finally, on February 18, 2018 an agreed final judgment was entered granting Pearl an easement across Section 21.

31. Drew Reid at the GLO was aware in August of 2016 that Pearl was being denied access to Section 22, but never told Pearl that it could and should seek a suspension of the running of the primary term by making an application to the School Land Board.[6]

---

[6] TEX. NAT. RES. CODE ANN. §52.0301 authorizes a state lessee who has been denied access to the leased premises to apply for a suspension to the School Land Board. See also ¶ 41 below.

32. In the meantime, in October 2016, Pearl's drilling contractor had moved a rig onto Section 20 to drill the Garnet State No. 4 well. Unfortunately, the drilling contractor experienced a freshwater blow out on that well, and it had to be brought under control and plugged. The Garnet State No. 4 well was plugged on February 10, 2017.

33. On March 4, 2017, Pearl commenced drilling the Garnet State No. 3 well, and completed it as a producing well on June 30, 2017. The production from that well maintained the State Leases in effect as to the S/2 of Section 20.[7]

34. After obtaining access to Section 22 in 2018, Pearl commenced preparations to drill the GS 2211HD well by filing its application for a permit on June 8, 2018. Pearl commenced operations on that well in July 2018 and made significant improvements to the surface in preparation for drilling the horizontal lateral and fracing that well in 2018 and 2019.

35. On October 16, 2019, Susan Draughn with the GLO sent a letter to Pearl requesting a release of the State Leases on all acreage but the S/2 of Section 20 or an explanation why Pearl disagrees with providing a release. On October 31, 2019 and subsequently in November Pearl communicated with Susan Draughn by various emails explaining what activities had been conducted on the State Leases to explain why no release was required.

36. On December 20, 2019, Larry Hargrave with the GLO sent a letter to Pearl asserting the State Leases had terminated on all but the S/2 of Section 20 and requesting a partial release.[8] On behalf of Pearl, Aimee Hess responded on January 13, 2020 explaining factually that Pearl had been denied access, and legally that Pearl's obligations under the lease have been suspended under the doctrine of impracticability.

---

[7] The GLO admits that the State Leases as to the S/2 of Section 20 are held by production.
[8] See Exhibit B attached. This letter constitutes a repudiation of the State Leases to the extent they cover the N/2 of Section 20 and S/2 of Section 22. Under Texas law, once the lessor repudiates a lease, the lessee has no further obligation to perform. See, *Kothman v. Boley,* 308 S.W. 2d 1 (Tex. 1957).

37. On February 13, 2020, Larry Hargrave responded by advising Pearl that the GLO had already filed a Designation of Terminated Acreage and Depths in Pecos County for many of the State Leases to the extent they cover the N/2 of Section 20 and the S/2 of Section 22.[9]

38. On May 13, 2020, Pearl, through its counsel, filed an application for suspension of the State Leases to the extent they cover the S/2 of Section 22, on the basis that Pearl was denied access to Section 22 from March 1, 2014 through February 28, 2018.[10]

39. On May 22, 2020, Larry Hargrave with the GLO sent a letter to Pearl's counsel stating that the Commissioner and School Land Board lacked authority to consider and grant the requested suspension because "some of the leases partially terminated prior to Pearl's application for suspension."[11]

40. On June 16, 2020 the School Land Board considered Pearl's suspension application and voted to deny it. On information and belief, Pearl alleges the basis for the denial of the suspension was based on the GLO's staff recommendation and argument that the State Leases had terminated prior to the suspension application, and therefore the Board lacked authority to grant the requested suspension.

### B. Basis for a Suspension and Improper Assertion of Termination.

41. TEX. NAT. RES. CODE. ANN. §52.0301 provides, in part, "if the lessee of a valid oil and gas lease granted by the state is unable to obtain access to the leased premises, . . . after a diligent, good faith attempt has been made by the lessee to obtain access . . . the lessee may file with the [School Land Board] an application describing and giving the date of the action that deprives the lessee of access to . . . the leased premises." The statute goes on to provide that "if the

---

[9] See Exhibit C attached.
[10] See Exhibit D attached. The exhibits to the application for suspension are not included in Exhibit D.
[11] See Exhibit E attached.

board is satisfied that the facts in the application are true and the lessee acted diligently and in good faith in an attempt to gain access, . . . the board may order suspension of the lease or any condition or covenant contained in the lease from the date the board determines to be the date the cause for suspension began." The statute then provides that "if the lease is suspended during its primary term, then, when the suspension ends, the primary term shall resume and continue to run for the remainder of the period specified in the lease."[12]

42. In addition, under Texas common law one party's obligation to perform is suspended or discharged when that party's performance is made impracticable without that party's fault by the occurrence of an event (in this case a denial of access) the non-occurrence of which (in this case an ability to get access with a drilling rig) was a basic assumption on which the contract was made, unless the language or the circumstances indicate the contrary. Section 261 of the Restatement (Second) of Contracts. *Tractebel Energy Marketing, Inc. v. E.I. Du Pont de Nemours & Co.*, 118 S.W.3d 60 (Tex. App. – Houston [14th Dist.] 2003, pet. denied).

43. There is no language in the State Leases that would indicate the contrary. In fact, the statute and the applicable rule suggest the GLO and the School Land Board recognize and follow this common law standard. Further, there is precedent establishing that the GLO and School Land Board approve suspension requests under similar circumstances when a state lessee is unable to negotiate access easements. As recently as July 2019 the GLO staff recommended, and the School Land Board retroactively approved a suspension request when a lessee was unable to negotiate an access road easement with a surface owner to get to a proposed drill site.[13]

---

[12] The rule adopted by the Commissioner at 31 TAC §9.38(a)(2) follows the language of the statute and provides for suspension where the lessee is unable to obtain access to the leased premises after making a diligent and good faith attempt.
[13] See Exhibit F attached. [GLO staff recommendation and confirmation of Board approval.]

44. In this case, in August 2016, before the stated primary term of the State Leases had expired, Pearl had advised Drew Reid at the GLO that it had been denied access to Section 22, and that a condemnation action was likely to be needed. Pearl asked Mr. Reid if Pearl should provide legal documentation, but Mr. Reid declined Pearl's offer while at the same time acknowledging the situation and apologizing for Pearl's "problem." Mr. Reid failed to mention or suggest that a suspension of the lease was available to Pearl.

45. Pearl kept the GLO informed when Gaynor Brandenburg first blocked access to Section 22, when Gaynor Brandenburg's father blocked access to Section 20, when Pearl was unable to get a temporary injunction requiring Gaynor Brandenburg to remove his trailer rig, when Pearl was unable to negotiate an easement across Section 21 necessitating condemnation, the progress of Pearl's condemnation proceeding and continued denial of access until the court awarded Pearl an easement on February 28, 2018. Because Pearl was denied access to the S/2 of Section 22 for four years beginning on March 1, 2014, the primary terms of the State Leases, at least as to Section 22, were suspended and did not commence again until February 28, 2018. When the GLO repudiated the State Leases on December 20, 2019, the primary terms of the earliest State Leases as to the S/2 of Section 22 had not yet expired.[14] When the GLO unilaterally filed its Designation of Partial Termination of Acreage and Depths on February 11, 2020, the primary terms of the earliest State Leases as to the S/2 of Section 22 had not yet expired. When Pearl submitted its suspension application on May 13, 2020, the primary terms of the earliest State Leases had not yet expired. And when the GLO staff concluded that the Commissioner and the

---

[14] As of March 1, 2014, there were two years, four months and 6 days remaining in the primary terms of the earliest State Leases taken on September 7, 2011. Once the primary terms commenced again on February 28, 2018, the earliest of those primary terms would not expire until June 7, 2020.

School Land Board lacked authority to consider or grant the suspension application on May 22, 2020, the primary terms of the earliest State Leases had not yet expired.

46. There are two parties to the State Leases. The State, acting through its agents is one party and Pearl is the other party. One party to a contract cannot unilaterally determine the contract has terminated over the disagreement of the other party and bind the disagreeing party. Likewise, the lessor of an oil and gas lease cannot unilaterally determine that an oil and gas lease has terminated over the disagreement of the lessee and bind that lessee. In this instance the GLO is asserting that some of the State Leases have terminated as to the N/2 of Section 20 and the S/2 of Section 22. But Pearl disagrees with the GLO, and no court of competent jurisdiction has determined that, in fact or as a matter of law, the State Leases as to Section 22 have terminated.

47. The improper assertion by the GLO that some of the State Leases as to the S/2 of Section 22 have terminated creates a cloud on Pearl's title. Further, the GLO's Designation of Terminated Acreage and Depths filed of record in Pecos County, Texas improperly clouds Pearl's title.

### C. Quiet Title – Suit to Remove Cloud on Title.

48. Pearl incorporates all allegations in Paragraphs 1 – 47 as if fully set forth herein and includes them in this cause of action.

49. The State Leases, at least as to the S/2 of Section 22, remain in full force and effect, and all such State Leases are still within their respective primary terms.

50. The GLO's assertion that the State Leases have terminated as to the S/2 of Section 22 constitutes and cloud on Pearl's title. The GLO's claim is invalid and unenforceable.

51. Pearl seeks a judgment removing the cloud on its title to the State Leases as to the S/2 of Section 22, and judgment declaring the Designation of Terminated Acreage and Depths filed of record in Pecos County, Texas invalid and of no force or effect.

### D. Trespass to Try Title.

52. Pearl incorporates all allegations in Paragraphs 1- 51 as if fully set forth herein and includes them in this cause of action.

53. Under TEX. PROP. CODE ANN. §22,001 Pearl files this claim for trespass to try title.

54. This trespass to try title claim relates the State Leases to the extent they cover the S/2 of Section 22, as detailed above. The State Leases are in full force and effect and within their respective primary terms as to the S/2 of Section 22 as detailed above.

55. Pearl was properly in possession of such State Leases on the S/2 of Section 22 when the GLO improperly entered upon and dispossessed Pearl of such State Leases beginning on December 20, 2019 when the GLO repudiated the State Leases as to the S/2 of Section 22. The GLO continues to improperly withhold possession from Pearl.

56. Pearl seeks a judgment from this Court granting Pearl possession of the State Leases as to the S/2 of Section 22.

## IV.
## PRAYER

Based on the foregoing, Pearl respectfully prays for the following relief:

a. The Court enter judgment denying the declaratory relief pled for by the GLO in its Complaint for Declaratory Judgment;

b. The Court award Pearl title to the State Leases as to the S/2 of Section 22;

c. The Court remove the cloud on Pearl's title to the State Leases as to the S/2 of Section 22 and declare the Designation of Terminated Acreage and Depths recorded by the GLO in Pecos County, Texas to be invalid and of no force or effect;

d. The Court award Pearl its attorneys' fees and costs; and

e. The Court grant all other relief, at law or in equity, to which Pearl may be justly entitled.

    Respectfully submitted,

    By: */s/ Dan Miller*
    DAN MILLER
    State Bar No. 14066500
    dmiller@msmtx.com
    **MCELROY, SULLIVAN, MILLER & WEBER, LLP**
    P.O. Box 12127
    Austin, Texas 78711
    1201 Spyglass Dr., Ste. 200 (78746)
    (512) 327-8111
    (512) 327-6566 Fax

    WALTER J. CICACK
    State Bar No. 04250535
    wcicack@hcgllp.com
    JEREMY M. MASTEN
    State Bar No. 24083454
    jmasten@hcgllp.com
    **HAWASH CICACK & GASTON LLP**
    3401 Allen Parkway, Suite 200
    Houston, Texas 77019
    (713) 658-9015 – tel/fax

    **ATTORNEYS FOR DEFENDANT,**
    **PEARL RESOURCES LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of June 2020, a true and correct copy of the above and foregoing document was provided via electronic filing service and e-mail as noted below:

Jason B. Binford
Abigail R. Ryan
Office of the Attorney General of Texas
Bankruptcy & Collections Division
P.O. Box 12548 MC008
Austin, Texas 78711-2548
jason.binford@oag.texas.gov
abigail.ryan@oag.texas.gov

**ATTORNEYS FOR THE TEXAS
GENERAL LAND OFFICE**

*/s/ Dan Miller*
**DAN MILLER**