**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 20-31585** |
| **PEARL RESOURCES LLC** | § | |
| **and** | § | **CHAPTER 11** |
| **PEARL RESOURCES OPERATING CO.** | § | |
| **LLC,** | § | |
| | § | |
| Debtors. | § | |
| | § | |
| **DAWN BUCKINGHAM, MD,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 20-3169** |
| | § | |
| **PEARL RESOURCES LLC** | § | |
| **and** | § | |
| **PEARL RESOURCES OPERATING CO.** | § | |
| **LLC,** | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION</u>

The instant dispute between the Texas General Land Office and Pearl Resources LLC arises from a disagreement between the parties as to the status of twenty-seven State oil and gas leases in Pecos County, Texas. The General Land Office's position is that the leases are partially terminated. Not surprisingly, Pearl Resources LLC and Pearl Resources Operating Co., LLC takes the opposite position.

On April 29, April 30, May 1, May 2, June 11, and September 17, 2024, the Court held a six-day trial and for the reasons stated herein, the Court finds that none of the twenty-seven State oil and gas leases in Pecos County, Texas were partially terminated and that all the leases became property of Pearl Resources LLC and Pearl Resources Operating Co., LLC's bankruptcy estate on March 3, 2020. The Court additionally grants judgment in favor of Pearl Resources LLC & Pearl

Resources Operating Co., LLC counterclaims for Quiet Title, Trespass to Try Title, and Breach of Contract. The Court also grants judgment in favor of the Texas General Land Office's counterclaim for Breach of Contract, denies the Texas General Land Office's counterclaim for Trespass to Try Title, and grants the Texas General Land Office's request for attorneys' fees. The Court further finds that Pearl Resources LLC & Pearl Resources Operating Co., LLC's damages of $43,155,664 is offset by those awarded to the Texas General Land Office in the amount of $2,578,633, for a total of $40,577,031. Pearl Resources LLC & Pearl Resources Operating Co., LLC's recovery of this $40,577,031 is barred by sovereign immunity.

## I.  FINDINGS OF FACT

This Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, which is made applicable to adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent that any finding of fact constitutes a conclusion of law, it is adopted as such. To the extent that any conclusion of law constitutes a finding of fact, it is adopted as such. This Court made certain oral findings and conclusions on the record. This Memorandum Opinion supplements those findings and conclusions. If there is an inconsistency, this Memorandum Opinion controls.

### A.  Background

1. On March 3, 2020, Pearl Resources LLC and Pearl Resources Operating Co. (collectively "*Pearl*") filed for relief under Chapter 11 of the United States Bankruptcy Code (the "*Petition Date*").[1]

2. On May 28, 2020, George P. Bush, Commissioner of the Texas General Land Office (the "*GLO*" or the "*State*"), by and through the Office of the Texas Attorney General, filed the instant Complaint for Declaratory Judgment (the "*Complaint*")[2] against Pearl.

---

[1] Bankr. ECF No. 1.
[2] ECF No. 1; "Bankr. ECF" refers docket entries made in the Debtor's bankruptcy case, No. 20-31585. Entries made in GLO's Case number 20-3169 shall take the format of ECF No. __.

3. For the purposes of this Memorandum Opinion and, to the extent not inconsistent herewith, this Court adopts and incorporates by reference each of the Background Facts in this Court's August 23, 2022 and December 13, 2023 Memorandum Opinions.[3]

4. On April 29, April 30, May 1, May 2, June 11, September 17, 2024, the Court held a six-day trial and ordered each party to submit proposed findings of fact and conclusions of law by December 2, 2024 (the "*Post-trial Order*").[4]

5. Pursuant to this Court's Post-trial Order, the Court took this matter under advisement[5] and now issues its instant Memorandum Opinion.

## B. Stipulations of Fact

1. The relationship between the GLO and Pearl arises from approximately 35 oil and gas leases (the "*State Leases*") issued for Sections 20 and 22 located in the H&GN RY Survey, Block 8 of Pecos County, Texas and covering 955.22 acres.[6]

2. The State Leases were issued pursuant to the Relinquishment Act, TEX. NAT. RES. CODE ANN. §§ 52.171 to 51.190 (the "*Relinquishment Act*"). Under the Relinquishment Act, the "owner of the soil," i.e., the surface owner, acts as the agent for the State of Texas in negotiating and executing oil and gas leases on Relinquishment Act Lands ("*RAL*"). Where, as in this matter, land held under an RAL is owned in common by multiple persons, each of those owners of an undivided interest is the State's agent as to its undivided interest.[7]

3. The GLO is an agency of the State of Texas.[8]

4. Where minerals are subject to the Relinquishment Act, section 52.171 of the Relinquishment Act provides that "the state . . . constitutes the owner of the soil [as] its agent for the purposes herein named . . . ." Such purpose is, under section 52.172 of the Relinquishment Act, to lease oil and gas on behalf of the GLO, which manages such documents.[9]

5. All of the State Leases are on the same GLO-promulgated form, the 1997 RAL form (the "*RAL Form Lease*").[10]

6. Surface owners of RAL may act as the agent of the GLO in negotiating and executing oil and gas leases on RAL.[11]

---

[3] ECF No. 110 and 226.
[4] ECF No. 353.
[5] *Id.*
[6] ECF No. 271 at 2.
[7] *Id.*
[8] ECF No. 271 at 4; *see also* TEX. NAT. RES. CODE ANN. § 31.011.
[9] ECF No. 271 at 4.
[10] *Id.*
[11] *Id.* at 5.

7.  There are multiple surface owners on Section 20 and Section 22.[12]

8.  Sections 20 and 22 are not contiguous.[13]

9.  In each of the State Leases, the lessee is provided with an express number of years as a term within which to explore for and produce oil and gas, which is deemed the "primary term." The primary term differs among the State Leases: 2 are 3 years, 6 are 1 year, and the balance are 5 years from the effective date of the lease.[14]

10. On or about June 17, 2016, Pearl obtained from the Railroad Commission (the "*RRC*") the drilling permit for the first of seven permitted wells on the acreage covered by the State Leases.[15]

11. An application to drill the Garnet State #1 was submitted on June 17, 2016, and approved on June 20, 2016, as a vertical well located on Section 22.[16]

12. An application to drill the Garnet State #2 was submitted on July 7, 2016, and approved on July 13, 2016, as a vertical well located on Section 22.[17]

13. An application to drill the Garnet State #3 was submitted on July 13, 2016, and approved on July 19, 2016, as a vertical well located on Section 20.[18]

14. The Garnet State #3 was spudded on March 4, 2017, was drilled to depth in the Wolfcamp Formation at 10,995 feet, was completed by hydraulic fracturing (fracking), and began production in paying quantities on June 30, 2017.[19]

15. A permit to drill the Garnet State #4 was approved on September 9, 2016, the well was spudded on October 24, 2016, and drilled to 4,800 feet (where it encountered a pressured freshwater zone at 3,100 feet), surface casing was set on November 17, 2016, and on February 10, 2017, this well was plugged and abandoned.[20]

16. A permit to drill the Garnet State #2021HA ("*Well 2021HA*") was approved on May 31, 2018, the well was spudded to a depth of 2,063 feet, and surface casing set on July 30, 2018.[21]

17. A permit to drill the Garnet State #2022HA ("*Well 2022HA*") was approved on June 1,

---

[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.* at 6.

2018, the well was spudded to a depth of 2,063 feet, and surface casing set on December 21, 2018.[22]

18. A permit to drill the Garnet State #2211HD ("*Well 2211HD*") was approved on June 8, 2018, the well was spudded to a depth of 2,063 feet and surface casing set on July 24, 2018.[23]

19. The Garnet State #3 is the only well drilled to 11,100 ft depth of the 7 permitted wells, is the only producing well on the Leased Acreage, and holds 320 acres of the applicable State Leases.[24]

20. The GLO sent a letter dated October 16, 2019, to Pearl (the "*First GLO Letter*") asserting that 27 of the 35 State Leases had terminated as to all but the 320 acres retained around Garnet State No. 3. (the "*Alleged Terminated Acreage*" or "*Alleged Terminated Leases*").

21. On December 20, 2019, the GLO sent Pearl a second letter (the "*Second GLO Letter*") repeating the GLO's assertion that the applicable leases had partially terminated and again demanding partial releases from Pearl.[25]

22. Pearl disputed the allegations in both the First GLO Letter and the Second GLO Letter and at no time did Pearl file the release requested by the GLO.[26]

23. On or about February 11, 2020, the Texas Land Commissioner filed a Designation of Terminated Acreages and Depths ("*DTAD*") in the real property records of Pecos County, Texas identifying the Alleged Terminated Acreage.[27]

24. On May 13, 2020, Pearl filed an application with the School Land Board ("*SLB*") for suspension of the 10 State Leases not included in the DTAD to the extent they cover the S/2 of Section 22 and the N/2 of Section 20.[28]

25. On June 16, 2020, the SLB voted to deny Pearl's suspension application.[29]

26. In March 2020, all existing Drilling Permits held by Pearl were automatically extended by the RRC to December 31, 2020, including for all of the 3 wells which were spud in 2018.[30]

27. On July 4, 2022, Pearl received approved applications with the RRC for an extension of deadline for plugging an inactive well (Form W-3X) for the Garnet State #2021HA, the Garnet State #2022HA, and the Garnet State #2211HD, which applications were approved

[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.* at 7.

by the RRC on July 4, 2022.[31]

## II.    CREDIBILITY OF THE WITNESSES

It is the Court's duty to assess and weigh the credibility of witnesses.[32] At trial, the Court heard testimony from four witnesses: (a) Susan Draughn ("*Ms. Draughn*"); (b) James Gregory Cloud ("*Mr. Cloud*"); (c) Drew Reid ("*Mr. Reid*"); and (d) Dr. Myra Dria ("*Dr. Dria*"). Each witness responded to questions clearly, completely, and directly.[33] Thus, the Court finds that each witness is credible and gives equal weight to the testimony of each witness.

## III.    CONCLUSIONS OF LAW

### A.  Jurisdiction and Venue

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334 and exercises its jurisdiction in accordance with Southern District of Texas General Order 2012–6.[34] Section 157 allows a district court to "refer" all bankruptcy and related cases to the bankruptcy court, wherein the latter court will appropriately preside over the matter.[35] This Court determines that pursuant to 28 U.S.C. § 157(b)(2)(A) and (O) this proceeding contains core matters, as it primarily involves proceedings concerning the administration of this estate.[36] This proceeding is also core under the general "catch-all" language because such a suit is the type of proceeding that can only arise in the context of a bankruptcy case.[37]

---

[31] *Id.*

[32] *O'Connor v. Burg* (*In re Burg*), 641 B.R. 120 (Bankr. S.D. Tex. 2022); *In re Bigler LP*, 458 B.R. 345, 367 (Bankr. S.D. Tex. 2011) (citing *Port Arthur Towing Co. v. John W. Towing, Inc.* (*In re Complaint of Port Arthur Towing Co.*), 42 F.3d 312, 318 (5th Cir. 1995)).

[33] *See e.g.*, *In re Ali*, 2015 Bankr. LEXIS 2443, 2015 WL 4611343 at *4 (Bankr. W.D. Tex. July 23, 2015) (analyzing the clarity, completeness, and quality of witness responses in order to make credibility determinations).

[34] *In re: Order of Reference to Bankruptcy Judges*, Gen. Order 2012–6 (S.D. Tex. May 24, 2012).

[35] 28 U.S.C. § 157(a); *see also* In re: Order of Reference to Bankruptcy Judges, Gen. Order 2012-6 (S.D. Tex. May 24, 2012).

[36] *See* 11 U.S.C. § 157(b)(2)(A) & (O).

[37] *See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.") (quoting *Wood v. Wood (In re Wood),* 825 F.2d 90, 97 (5th Cir. 1987)).

This Court may only hear a case in which venue is proper.[38] 28 U.S.C. § 1409(a) provides that "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending." Debtors have their principal place of business in Houston Texas and therefore, venue of this proceeding is proper.[39]

## B. Constitutional Authority to Enter a Final Order

While bankruptcy judges can issue final orders and judgments for core proceedings, absent consent, they can only issue reports and recommendations on non-core matters.[40] The instant proceeding before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).[41] Accordingly, this Court concludes that the narrow limitation imposed by *Stern* does not prohibit this Court from entering a final order here.[42] Alternatively, this Court has constitutional authority to enter a final order because all parties in interest have consented, impliedly if not explicitly, to adjudication of this dispute by this Court.[43] Both of these parties have consented to this Court's constitutional authority to enter a final order or judgment.[44] These circumstances unquestionably constitute express consent. Thus, this Court wields the constitutional authority to enter a final order here.

---

[38] 28 U.S.C. § 1408.

[39] Bankr. ECF No. 1.

[40] *See* 28 U.S.C. §§ 157(b)(1), (c)(1); *see also Stern v. Marshall*, 564 U.S. 462, 480 (2011); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1938–40 (2015).

[41] ECF No. 271 at 4.

[42] *See, e.g., Badami v. Sears (In re AFY, Inc.),* 461 B.R. 541, 547-48 (8th Cir. BAP 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); see also *Tanguy v. West (In re Davis),* No. 00-50129, 538 F. App'x 440, 443 (5th Cir. 2013) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect' .... We decline to extend *Stern's* limited holding herein.") (Citing *Stern*, 564 U.S. at 475, 503, 131 S.Ct. 2594).

[43] *Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S.655, 135 S. Ct. 1932, 1947, 191 L.Ed.2d 911 (2015) ("*Sharif* contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent . . . .").

[44] ECF No. 21; ECF No. 22.

# IV. ANALYSIS

## A. GLO's Complaint

The GLO, in its Complaint, brings solely one cause of action, to wit: a declaratory judgement that the State Leases have partially terminated by operation of law prior to the Petition Date and thus, the State Leases are not property of the Pearl' bankruptcy estate.[45] The GLO takes the position that some of the State Leases, specifically the Alleged Terminated Acreage subject to the DTAD, were partially terminated by operation of law on February 11, 2020, prior to the Petition Date.[46] Pearl asserts that these leases did not terminate, and they are instead part of the Pearl's bankruptcy estate.[47] At trial, the GLO clarified that not all State Leases have partially terminated, but only the Alleged Terminated Leases.[48]

Pearl's State Leases are subject to RAL Form Lease which provides for partial termination under the following circumstances found in paragraph 16 of each lease:

> (A) VERTICAL. In the event this lease is in force and effect two (2) years after the expiration date of the primary or extended term it shall then terminate as to all of the leased premises, EXCEPT (1) 40 acres surrounding each oil well capable of producing in paying quantities and 320 acres surrounding each gas well capable of producing in paying quantities (including a shut-in oil or gas well as provided in Paragraph 14 hereof), or a well upon which Lessee is then engaged in continuous drilling or reworking operations, or . . . (3) such greater or lesser number of acres as may then be allocated for production purposes to a proration unit for each such producing well under the rules and regulations of the Railroad Commission of Texas . . . .
>
> (B) HORIZONTAL. In the event this lease is in force and effect two (2) years after the expiration date of the primary or extended term it shall further terminate as to all depths below 100 feet below the total depth drilled (hereinafter "deeper depths") in each well located on acreage retained in Paragraph 16(A) above, unless on or before two (2) years after the primary or extended term Lessee pays an amount equal to one-half (1/2) of the bonus originally paid as consideration for this lease. If such amount is paid, this lease shall be in force and effect as to such deeper depths, and said termination shall be delayed for an additional period of two (2)

[45] ECF No. 1.
[46] *Id.*
[47] ECF No. 271 at 4.
[48] Courtroom Hearing – April 29, 2024 (Opening statements).

years and so long thereafter as oil or gas is produced in paying quantities from such deeper depths covered by this lease.

(C) IDENTIFICATION AND FILING. . . . Within thirty (30) days after partial termination of this lease as provided herein, Lessee shall execute and record a release or releases containing a satisfactory legal description of the acreage and/or depths not retained hereunder. . . . If Lessee fails or refuses to execute and record such release or releases within ninety (90) days after being requested to do so by the General Land Office, then the Commissioner at his sole discretion may designate by written instrument the acreage and/or depths to be released hereunder and record such instrument at Lessee's expense in the county or counties where the lease is located and in the official records of the General Land Office and such designation shall be binding upon Lessee for all purposes.[49]

The GLO does not dispute that Pearl maintained sufficient drilling operations during the primary term of the State Leases,[50] but instead maintains that the Alleged Terminated Leases terminated by operation of law at the conclusion of the secondary/extended term, or what the GLO refers to as the "Snapshot Date."[51] The applicable "Snapshot Dates" are represented in the following table[52] as labeled "E":

| A. | B. | C. | D. | E. |
|---|---|---|---|---|
| Each Lease at Issue[53] | Lease Date | Primary Term in Years | Primary Term End/ Start of Secondary Term | Secondary Term End |
| | | | | |
| DD | 9/1/2011 | 5 | 9/1/2016 | 9/1/2018 |
| E, L, A, T, G, D, M, U, F, K | 9/7/2011 | 5 | 9/7/2016 | 9/7/2018 |
| P, R, Q | 9/13/2011 | 5 | 9/13/2016 | 9/13/2018 |
| Y, C | 10/4/2011 | 5 | 10/4/2016 | 10/4/2018 |
| X, W | 10/5/2011 | 5 | 10/5/2016 | 10/5/2018 |
| V | 10/6/2011 | 5 | 10/6/2016 | 10/6/2018 |
| J | 10/8/2011 | 5 | 10/8/2016 | 10/8/2018 |
| S | 11/8/2011 | 5 | 11/8/2016 | 11/8/2018 |
| OO | 7/26/2016 | 1 | 7/26/2017 | 7/26/2019 |
| PP, RR | 8/16/2016 | 1 | 8/16/2017 | 8/16/2019 |
| QQ | 8/17/2016 | 1 | 8/17/2017 | 8/17/2019 |

[49] *See, e.g.*, ECF No. 270-1 at 5-6.
[50] Courtroom Hearing – April 29, 2024 (Opening statements).
[51] *Id.*
[52] *See* ECF No. 270-1; *see also* ECF No. 279-2.
[53] Each lease is labeled "MF113155" with a corresponding letter to distinguish the leash; *see also* ECF No. 270-1.

| | | | | |
|---|---|---|---|---|
| SS | 8/25/2016 | 1 | 8/25/2017 | 8/25/2019 |
| TT | 9/9/2016 | 1 | 9/9/2017 | 9/9/2019 |

Pursuant to paragraph 16(a) of the State Leases, a lease held by production into the secondary term shall, nevertheless, terminate as to all Leased Acreage, except for certain acreage (the "*Retained Acreage*") around a well (i) that is capable of production in paying quantities, or (ii) upon which lessee "is then" engaged in continuous drilling or reworking operations.[54] The GLO has acknowledged that Pearl retains 320 acres around Garnet State No. 3, under Paragraph 16(A) of the State Leases regarding Retained Acreage.[55] The remaining question is whether Pearl was engaged in continuous drilling operations on the dates listed in column E *supra* to preserve rights in the Alleged Terminated Acreage subject to the DTAD.[56]

As a preliminary issue, Pearl raises two arguments, to wit: (1) the RAL Form Leases are ambiguous, and the applicable "Snapshot Date" for each lease could actually be interpreted as two years after the secondary term ends; and (2) that the "Snapshot Date" is the only applicable date for partial termination, as using any arbitrary date after the "Snapshot Date" would constitute an improper rolling termination.[57]

Pearl's first argument focuses on the first sentence of paragraph 16 of the RAL Form Lease, which states: "[i]n the event this lease is in force and effect two (2) years after the expiration date of the primary or extended term it shall then terminate as to all of the leased premises…."[58] The Court agrees that this sentence effectively creates two distinct "Snapshot Dates", one at the

---

[54] ECF No. 270-1 at 5-6.
[55] ECF No. 314-1 at 67.
[56] *See, e.g.*, ECF No. 270-1 at 5-6.
[57] Courtroom Hearing – September 17, 2024 (Closing arguments).
[58] *Id.*

conclusion of the secondary term as represented in column E *supra* (the "*First Snapshot Date*"), and one two years after the expiration of the secondary term (the "*Second Snapshot Date*").[59]

Pearl's second argument is that any efforts by the GLO to assert that Pearl's Alleged Terminated Leases terminated by operation of law by virtue of a "rolling termination" should be rejected as it runs afoul of the plain language of the State Leases.[60] Specifically, Pearl points to *Apache Deepwater, LLC v. Double Eagle Dev., LLC*, for the proposition that under Texas law, unless a lease specifically calls for a rolling termination, a retained acreage provision only operates once and not at any point thereafter.[61] As explained by the court in *Apache*, a retained acreage clause must expressly provide for rolling termination with clear language.[62] This is because "draftsmen understand how to create rolling termination clauses in oil and gas leases."[63]

The retained acreage clause in paragraph 16 of the lease here provides: "[i]n the event this lease is in force and effect two (2) years after the expiration date of the primary or extended term it shall then terminate as to all of the leased premises EXCEPT…" (the "*Retained Acreage Clause*").[64] As drafted, this portion of the lease creates two distinct "Snapshot Dates" as described *supra*, that expressly outlines when a partial termination can occur.[65] The Retained Acreage Clause does not indicate that the GLO can arbitrarily choose a date between the First Snapshot Date and the Second Snapshot Date, but instead explicitly provides for two separate points of partial

---

[59] *See generally* ECF No. 270-1.

[60] Courtroom Hearing – September 17, 2024 (Closing arguments).

[61] 557 S.W.3d 650, 657 (Tex. App.—El Paso 2017, pet. denied).

[62] *Id.* at 656; *see also Chesapeake Exploration., L.L.C. v. Energen Resources Corp.*, 445 S.W.3d 878, 883 (Tex. App. —El Paso 2014, no pet.).

[63] *Apache Deepwater, LLC*, 557 S.W.3d at 657 (citing *Parten v. Cannon*, 829 S.W.2d 327, 329 (Tex. App. —Waco 1992, writ denied)(rolling terminations created with lease language stating that production or operations would "maintain this lease in effect only with regard" to proration unit with producing wells or wells under development and the lease "shall terminate as to such part or parts of the leased land lying outside"); *Hunt Oil Co. v. Dishman*, 352 S.W.2d 760, 761 (Tex. Civ. App. —Beaumont 1961, writ ref'd n.r.e.)(language that Lessor "at any time" could notify lessee of non-compliance of development obligation, and allowing lessee to retain only that acreage around operating wells).

[64] *See* ECF No. 270-1.

[65] *Id.*

termination that must occur on either the First Snapshot Date or the Second Snapshot Date.[66] Furthermore, the partial termination occurs automatically unless an exception applies.[67]

Because the Second Snapshot Date for all of the Alleged Terminated Leases are later than Pearl's Petition Date, the question before the Court is properly stated as whether Pearl's Alleged Terminated Leases were partially terminated by operation of law at the time of the First Snapshot Date for each of the Alleged Terminated Leases.

### 1. Whether Pearl's State Leases were partially terminated by operation of law

On October 15, 2019, the GLO sent notice to Pearl that Pearl's Alleged Terminated Leases had been partially terminated.[68] Notably, the First GLO Letter asserted that the GLO had completed a review of Pearl's State Leases, but gave Pearl an opportunity to disagree with the GLO's assessment; failure of which would result in the Alleged Terminated Acreage to terminate pursuant to paragraph 16 of the State Leases.[69] It was not until December 20, 2019, that the GLO sent Pearl the Second GLO Letter, reiterating that the State Leases had partially terminated, asserting that Pearl had an obligation under paragraph 16 of the State Leases to file a release.[70]

As a preliminary matter and as stated *supra*, the GLO, through use of the First GLO Letter and the Second GLO Letter attempted to effectuate a partial termination pursuant to the Retained Acreage Clause of the State Leases on October 16, 2019, more than a year after the First Snapshot Date for most of the Alleged Terminated Leases.[71] However, the State Leases are clear that any termination that occurs is automatic, and such termination occurs on either the First Snapshot Date

---

[66] *Id.*; *see also Apache Deepwater, LLC*, 557 S.W.3d at 656-57.
[67] *See PPC Acquisition Co. LLC v. Del. Basin Res., LLC*, 619 S.W.3d 338, 350 (Tex. App. —El Paso 2021, no pet.).
[68] ECF No. 270-10.
[69] *Id.*
[70] ECF No. 270-11.
[71] *See* ECF No. 303 at 190-91.

or Second Snapshot Date.[72] As such, despite the GLO's attempt to wholesale declare the Alleged Terminated Leases as partially terminated on October 16, 2019, the terms of the State Leases require an actual inquiry as to whether Pearl was engaged in drilling operations for each of the Alleged Terminated Leases on the First Snapshot Date.

Drilling operations, as defined in the Texas Administrative Code, "consists of all the activities designed and conducted in an effort to obtain initial production from a well."[73] The Texas Supreme Court explains that "drilling or reworking operations," encompasses more than just "drilling"—they are "activit[ies undertaken] towards obtaining production."[74] Drilling, in contrast of drilling operations, is defined as "[a]ct of boring a hole through which oil and/or gas may be produced if encountered in commercial quantities."[75]

At trial, Ms. Draughn, witness for the GLO who purportedly attempted to effectuate the partial termination of Pearl's Alleged Terminated Leases through the First GLO Letter, testified at length regarding the GLO's process for partial termination.[76] She testified that Pearl had engaged in "drilling operations," but found them to be insufficient to survive partial termination because, from her belief, "the drilling operations that were conducted on … Pearl's lease were insufficient to get to a producing well."[77] Furthermore, when asked "whenever the GLO determined, unilaterally, in October of 2019, that it was believed Pearl was not engaged in something…sufficient to maintain the acreage under paragraph 16 of the lease, what was it that the GLO thought Pearl had not done, drilling operations or drilling?" Ms. Draughn replied

---

[72] ECF No. 270-1; *see also Sutton v. SM Energy Co.*, 421 S.W.3d 153, 159 (Tex. App.—San Antonio 2013, no pet.) (construing provision in the parties' retained acreage clause as a special limitation, where it expressly provided that if the lessee failed to commence drilling additional wells within a certain time period, the lease "shall automatically terminate" except for acreage included within each existing well tract).

[73] 31 TEX. ADMIN. CODE § 9.31(b)(2).

[74] *See Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 158 (Tex. 2004).

[75] *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 211 (Tex. 2011).

[76] *See generally*, ECF No. 300.

[77] ECF No. 300 at 135.

"drilling."[78] To preserve acreage under the Retained Acreage Clause however does not call for drilling; drilling operations is sufficient.[79]

Dr. Dria testified on behalf of Pearl, and outlined the following activities as evidence of Pearl's drilling operations in which Pearl was engaged on the First Snapshot Date for each of the Alleged Terminated Leases:

| Lease | First Snapshot Date | Pearl's drilling operations as of the First Snapshot Date |
|---|---|---|
| DD E, L, A, T, G, D, M, U, F, K | 9/1/2018 9/7/2018 | Infrastructure development for Sections 20 and 22, which included dirt work, fencing, pumping water; purchasing diesel fuel for generators for pumping water; renting generators for pumping water; repair frack tank for 2021HA.[80] |
| P, R, Q, Y, C, X, W, V, J | 9/13/2018 10/4/2018 10/5/2018 10/6/2018 10/8/2018 | Infrastructure development for Sections 20 and 22, which included dirt work, fencing, pumping water; purchasing diesel fuel for generators for pumping water; renting generators for pumping water; repair frack tank for 2021HA; drill conductor hole for 2022HA.[81] |
| S | 11/8/2018 | Infrastructure development for Sections 20 and 22, which included dirt work and fencing, pump water, purchase diesel fuel, drill at 2021HA, install water pumps, prepare for larger rig on Section 22.[82] |
| OO PP, RR QQ SS TT | 7/26/2019 8/16/2019 8/17/2019 8/25/2018 9/9/2019 | Infrastructure development for Sections 20 and 22, which included dirt work and fencing, paint fences purple to reduce vandalism, pump water, purchase diesel fuel.[83] |

[78] *Id.* at 137.
[79] ECF No. 270-1.
[80] *See* ECF No. 301 at 213-228; ECF No. 302 at 7-88; *see generally* ECF. No. 279-2 at 2-9.
[81] *Id.*
[82] *Id.*
[83] *Id.*

Mr. Cloud, expert for the GLO, conceded that some of these activities such as "spudding of three Garnett State long-lateral-horizontal phantom Wolfcamp wells" were indicative of drilling operations on the Alleged Terminated Leases, but asserted that some activities, such as repairing frac pits and failing to re-engage operations on the spudded wells through December 2019 demonstrate non-continuous drilling operations.[84] However, Mr. Cloud also conceded that he only looked at one "Snapshot Date" when determining whether Pearl engaged in continuous drilling operations, September 16, 2019, set "as late as possible" to encompass "the last leases that had an end of secondary date of 2019.[85] He further acknowledged that each "snapshot date is going to be individual for each of the leases" but asserted no actual production meant that there would be no difference as to any of the Alleged Terminated Leases.[86] Nevertheless, as explained *supra*, utilizing a "Snapshot Date" other than the First Snapshot Date improperly penalizes a lessee by virtue of the GLO essentially employing a rolling termination. Furthermore, while Mr. Cloud's interpretation of some of Pearl's activities indicated that they appeared to be maintenance, some maintenance, especially when paired with other activities such as spudding, is certainly essential and expected as part of continuous drilling operations.

Accordingly, the Court finds the activities set forth in the foregoing chart are drilling operations and were continuing drilling operations on the applicable dates because each activity was designed to, and being conducted for the purpose of obtaining, initial production from a well.[87] As such, the GLO's position that the Alleged Terminated Leases had partially terminated by operation of law is incorrect as the GLO has failed to meet its burden. Thus, the Court finds that

---

[84] ECF No. 303 at 142-158.
[85] ECF No. 303 at 188.
[86] ECF No. 303 at 190.
[87] ECF No. 301, Trial Tr. at 196:6–212:11.

the Alleged Terminated Leases and therefore all of the State Leases, became property of the estate upon Pearl filing for bankruptcy.[88] The Court will next consider Pearl's counterclaims.

## B.    Pearl's Amended Answer

Pearl asserts three counterclaims against the GLO, to wit: (1) Quiet Title – Suit to Remove Cloud on Title; (2) Trespass to Try Title; and (3) Breach of Contract.[89] Pearl bears the burden of proving these counterclaims.[90] The Court will address each in turn.

### 1.  Quiet Title

Pearl asserts that the GLO's filing of the DTAD improperly clouds Pearl's title to the State Leases and seeks a judgment removing the could on its title to all of its leases generally and declaring the DTAD filing of record in Pecos County, Texas invalid and of no force of effect.[91]

To prevail in a suit to quiet title, a claimant must prove: (1) he has an interest in a specific property; (2) title to the property is affected by a claim of the defendant; and (3) the defendant's claim, although facially valid, is invalid or unenforceable.[92]

As explained *supra*, Pearl has a valid, unterminated interest in the State Leases, of which the Alleged Terminated Leases have been impacted by the filing of the DTAD, and the DTAD is invalid as the GLO failed to carry its burden that any of the State Leases terminated pursuant to the terms of the State Leases. As such, Pearl has met its burden to quiet title. Accordingly, the DTAD filed in the Pecos County records, regarding State Lease No. MF-113155 covering All of

---

[88] *See* 11 U.S.C. § 541(a)(1) (The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held . . . [e]xcept as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case).

[89] ECF No. 67 at 12-14.

[90] *Fernandez v. Abita Springs Water Co.*, 2005 U.S. Dist. LEXIS 8361 (E.D. La. 2005) (Parties asserting cross-claims, counterclaims, and third-party claims have the burden of proving their claims by a preponderance of the evidence).

[91] ECF No. 67 at 12-13.

[92] *Farkas v. Aurora Loan Servs., L.L.C.*, No. 05-15-01225-CV, 2017 Tex. App. LEXIS 4912, at *21-22 (Tex. App. May 30, 2017).

Section 20 and the South half of Section 22, Block 8, H&GN Ry. Co., Pecos County, Texas, containing 955.22 acres recorded in the Official Public Records of Pecos County, Texas and on file in the Archives and Record of the Texas General Land Office in Mineral File MF-113155, filed in the real property records of Pecos County, Texas, is invalid and of no force or effect.[93] The Court will next consider Pearl's trespass to try title counterclaim.

## 2. Trespass to Try Title

Pearl asserts that Pearl was properly in possession of the State Leases when the GLO entered upon and dispossessed Pearl when the GLO repudiated the State Leases when it filed the DTAD.[94]

To recover on their trespass-to-try-title claim the Plaintiffs had to carry the burden at trial to prove a prima facie right to title and possession by one of four methods: (1) by proving a regular chain of conveyances from the sovereign, (2) by proving a superior title out of a common source, (3) by proving title by limitations, or (4) by proving prior possession and that the possession has not been abandoned.[95]

Based on the foregoing, Pearl has carried its burden to demonstrate a regular chain of conveyances from the sovereign. Namely, Pearl demonstrated that the State Leases descended from the sovereign and that Pearl ultimately became the proper lessee and that it has a superior title to the GLO because the DTAD was improperly filed.[96] Pearl was properly in possession of the DTAD Leases when the GLO improperly entered upon and dispossessed Pearl of such DTAD Leases beginning on February 11, 2020, when it filed the DTAD.[97] Accordingly, Pearl is entitled

---

[93] ECF No. 270-8.
[94] ECF No. 67 at 13.
[95] *Brooks v. Binger*, No. 14-17-00562-CV, 2019 Tex. App. LEXIS 5882, at *6 (Tex. App. July 11, 2019).
[96] *Brooks v. Binger*, No. 14-17-00562-CV, 2019 Tex. App. LEXIS 5882, at *6 (Tex. App. July 11, 2019).
[97] ECF No. 270-10.

to possession of all of Section 20 and the South half of Section 22, Block 8, H&GN Ry. Co., Pecos County, Texas, containing 955.22 acres recorded in the Official Public Records of Pecos County, Texas and on file in the Archives and Record of the Texas General Land Office in Mineral File MF-113155, which was improperly terminated by the Designation of Terminated Acreages and Depths filed in the real property records of Pecos County, Texas, the acreage improperly terminated by the DTAD.[98] The Court will next consider Pearl's breach of contract counterclaim.

### 3. Breach of Contract

Pearl asserts that the GLO's conduct, including the filing of the DTAD, was a violation of the State Leases giving rise to a breach of contract claim.[99] The GLO asserts the affirmative defense of prior material breach, asserting that Pearl's breach of paragraph 17 of the States Leases occurred prior to the GLO's alleged breach of contract.[100]

To recover on its breach of contact claim, Pearl must show: (1) the evidence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.[101] When one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.[102] The contention that a party is excused from its contract performance by the other party's prior material breach is an affirmative defense.[103] Non-material breaches do not excuse future performance by the non-breaching party.[104]

---

[98] *Id.*
[99] ECF No. 67 at 14.
[100] ECF No. 127 at 8.
[101] *TotalEnergies Petrochemicals & Refin. USA, Inc. v. Kinder Morgan Petcoke, LP*, 658 S.W.3d 647, 660 (Tex. App. 2022).
[102] *PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 633 (Tex. 2008).
[103] *Henry v. Masson*, 333 S.W.3d 825, 834 (Tex. App.—Houston [1st Dist.] 2010, no pet.).
[104] *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017).

Neither party disputes that the State Leases are valid contracts.[105] As to the second element, Pearl asserts that it performed its obligations under the Alleged Terminated Leases until Pearl was relieved from performance by repudiation by the GLO through filing of the DTAD.[106] The GLO however, asserts that Pearl cannot satisfy this second element because (1) Pearl failed to file releases as required by paragraph 16(c) of the States Leases; and (2) because Pearl failed to drill and offset well as required by paragraph 17 of the State Leases.[107] Because the Court has already found that Pearl's interest in the Alleged Terminated Leases were improperly terminated as discussed *supra*, Pearl was therefore not required to satisfy paragraph 16(c) of the State Leases which is only applicable upon a partial termination pursuant to paragraph 16(a).[108] Thus, the analysis turns to whether Pearl was required to and failed to drill an offset well pursuant to paragraph 17 of the State Leases.

Paragraph 17 of the State Leases provides:

17. OFFSET WELLS Neither the bonus, delay rentals, nor royalties paid, or to be paid, under this lease shall relieve Lessee of his obligation to protect the oil and gas under the above-described land from being drained. Lessee, sublessee, receiver or other agent in control of the leased premises shall drill as many wells as the facts may justify and shall use appropriate means and drill to a depth necessary to prevent undue drainage of oil and gas from the leased premises. In addition, if oil and/or gas should be produced in commercial quantities within 1,000 feet of the leased premises, or in any case where the leased premises is being drained by production of oil or gas, the Lessee, sublessee, receiver or other agent in control of the leased premises shall in good faith begin the drilling of a well or wells upon the leased premises within 100 days after the draining well or wells or the well or wells completed within 1,000 feet of the leased premises start producing in commercial quantities and shall prosecute such drilling with diligence. Failure to satisfy the statutory offset obligation may subject this lease and the owner of the soil's agency rights to forfeiture [sic] Only upon the determination of the Commissioner of the General Land Office and with his written approval may the payment of

---

[105] Courtroom Hearing – September 17, 2024 (Closing arguments).
[106] *Id.*
[107] *Id.*
[108] ECF No. 270-1.

compensatory royalty under applicable statutory parameters satisfy the obligation to drill an offset well or wells required under this paragraph.[109]

Paragraph 17 memorializes an obligation of a lessee under the Relinquishment Act to drill an offset well pursuant to Texas Natural Resource Code § 52.173.[110] Both the statue and paragraph 17 require a lessee to begin the drilling of a well or wells upon such state land within 100 days after the draining well or wells completed within 1,000 feet of the state land commence to produce in commercial quantities, and the lessee shall prosecute such drilling with diligence to "reasonably develop the state land and to protect such state land against drainage."[111]

At trial, Mr. Reid testified on behalf of the GLO regarding the offset well drilling obligation that is triggered when another well produces in commercial qualities.[112] Specifically, he noted that the Whiskey River 19.5B-8 Lease, Well No. 1H in the Wolfcamp formation (the "*Whiskey River Well*"), drilled and completed by Jagged Peak Energy, LLC ("*Jagged Peak*") at a depth of 10,366 feet, had reached production as of November 15, 2017, approximately 300 feet away from Section 20.[113] Based on this testimony and the plain language of Texas Natural Resource Code § 52.173 and paragraph 17 of the State Leases, the GLO asserts that Pearl had an obligation to drill an offset well by February 23, 2018.[114]

Dr. Dria disputed Mr. Reid's testimony, claiming that an operator would not be aware of when a well was actually producing in commercial quantities until there was a public completion report for the Whiskey River Well.[115] The completion report for the Whiskey River Well went public on May 17, 2018, to which Pearl asserts at that time begins the 100 day offset well

---

[109] *See e.g.*, ECF No. 270-1 at 6.
[110] *Compare* ECF No. 270; TEX. NAT. RES. CODE § 52.173.
[111] TEX. NAT. RES. CODE § 52.173; ECF No. 270-1 at 6.
[112] ECF No. 301 at 24.
[113] ECF No. 301 at 38-39; *see also* ECF No. 280-6, 270-28 at 2-3.
[114] Courtroom Hearing – September 17, 2024 (Closing arguments).
[115] ECF No. 346-1 at 18.

requirement pursuant to field rules promulgated by the Texas Railroad Commission.[116] Despite this testimony, Dr. Dria also testified that "we knew we had to drill a horizontal well at 2021" because Jagged Peak was "going to come in and drill an offset well…sooner than later" in response to what Pearl did after June of 2017 with respect to the State Leases.[117]

The Court finds both the plain language of Texas Natural Resource Code § 52.173 and paragraph 17 of the State Leases is clear and unambiguous. Pearl had an obligation to drill an offset well within 100 days of the Whiskey River Well reaching production as of November 15, 2017.[118] Dr. Dria admitted that Pearl did not perform any actual drilling within 100 days of November 15, 2017, for Well 2021HA, the applicable offset well that would have satisfied Pearl's obligation.[119] As such, the Court finds that Pearl unequivocally breached its obligation under both Texas Natural Resource Code § 52.173 and paragraph 17 of the State Leases.

Furthermore, even if Pearl was correct that the 100-day offset well requirement did not begin tolling until the completion report for the Whiskey River Well went public on May 17, 2018, Pearl still failed to satisfy both Texas Natural Resource Code § 52.173 and paragraph 17 of the State Leases. While actual drilling for Well 2021HA began within the prescribed 100-day period, the drilling rig was released on August 4, 2018, and Well 2021HA was staked in September and October of 2018.[120] Pearl took no further action to drill an offset well and asserted that Pearl only did so because the GLO had repudiated the Alleged Terminated Leases.[121] However, as discussed *supra*, this repudiation did not occur until October 2019, and Pearl fails to provide a sufficient

---

[116] *Id.* at 22.
[117] ECF No. 301 at 168.
[118] ECF No. 272-58 at 140; *see also Bell v. Chesapeake Energy Corp.*, 2019 Tex. App. LEXIS 1978 (Tex. App. 2019).
[119] ECF No. 346-1 at 109.
[120] *Id.*
[121] *Id.* at 102 ("That's when the GLO interfered, and they terminated my leasehold that was under the proration unit for this well.").

explanation for why it did not "prosecute such drilling with diligence" as required by both Texas Natural Resource Code § 52.173 and paragraph 17 of the State Leases. Additionally, Dr. Dria even testified that unlike Well 2211HA, a well where spudding was intended to produce hydrocarbons, the spudding on Well 2021HA was never meant to obtain hydrocarbons.[122] Despite Dr. Dria's testimony indicating that time is of the essence once initial production of a well occurs, Pearl took no action to prosecute drilling of an offset well with diligence.[123] Such inaction, paired with no evidence that Pearl attempted to pay a compensatory royalty in lieu of performance pursuant to Texas Natural Resource Code § 52.173 and paragraph 17 of the State Leases, establishes that Pearl breached its obligations.

Nevertheless, despite Pearl's clear breach of the State Leases, the analysis next turns to whether such breach was material to determine whether the GLO's affirmative defenses of prior material breach succeeds.[124] The Texas Supreme Court teaches that materiality is an issue "to be determined by the trier of facts."[125] In *Mustang Pipeline*, the Texas Supreme Court outlined several factors enumerated in the Restatement that are "significant in determining whether a failure to perform is material."[126] These factors include:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances;

---

[122] Courtroom Hearing – September 17, 2024 (Dr. Dria, testifying).
[123] ECF No. 314-4; ECF No. 270-15.
[124] *See Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994).
[125] *Hudson v. Wakefield*, 645 S.W.2d 427, 430 (Tex. 1983).
[126] 134 S.W.3d at 199 (citing RESTATEMENT (SECOND) OF CONTRACTS § 241 (Am. Law Inst. 1981)).

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[127]

The injured party, the GLO here, is provided specific remedies under both Texas Natural Resource Code § 52.174 and paragraph 17 of the State Leases, namely, the opportunity to "subject this lease and the owner of the soil's agency rights to forfeiture."[128] Texas Natural Resource Code § 52.174 specifically lays out how the process occurs, including the responsibility of the Commissioner of the General Land Office to "write and sign officially words declaring such forfeiture" and mailing notice of this action within 30 days after the declaration of the forfeiture.[129] The GLO provided no evidence at any time indicating compliance with this statute, and instead, as examined *infra*, seeks damages in the form of compensatory royalties as outlined by Mr. Cloud's expert testimony.[130] The GLO therefore concedes by their actions that they can be adequately compensated for the part of the benefit of which the GLO was deprived. The compensatory royalties cure Pearl's failure and replenishes the benefit the GLO was to receive under paragraph 17. Furthermore, while forfeiture could have occurred under these facts, the GLO instead have only ever sought partial termination based on the Retained Acreage Clause and not under paragraph 17 or Texas Natural Resource Code § 52.174.[131] As such, the Court finds that the totality of these factors indicate that Pearl's breach was immaterial, entitling the GLO to damages as examined *infra*, but not entitling the GLO to its affirmative defense of prior material breach. Thus, while Pearl immaterially breached its obligations under the State Leases, the Court finds that Pearl has otherwise satisfied the second element of its breach of contract claim against the GLO.

---

[127] *Id.*
[128] ECF No. 270-1 at 6.
[129] TEX. NAT. RES. CODE § 52.174.
[130] *See* ECF No. 303.
[131] *See* ECF No. 1.

As examined *supra*, Pearl satisfied the third element of its breach of contract claim because the GLO repudiated the Alleged Terminated Leases by filing the DTAD.[132]

The GLO's improper filing of the DTAD entitles Pearl to damages caused by the GLO's breach.[133] Pearl through testimony of Dr. Dria asserts that the GLO's breach entitles Pearl to $165,955,664 in damages, comprised of (1) $16,293,915 from increased drilling costs; (2) $21,152,000 from decreased well value; (3) $2,206,000 from increased facility costs; (4) $72,300,000 financial loss from drainage; (5) $50,500,000 damages from reduced viability of the wells, and (f) $3,504,133 from required infrastructure repair.[134] Mr. Cloud, testifying on behalf of the GLO, acknowledged that prices have gone up.[135] The Court finds that the following damages were caused by the GLO's breach: $16,293,915 from increased drilling costs; $21,152,000 from decreased well value; $2,206,000 from increased facility costs; and $3,504,133 from required infrastructure repair.[136] Pearl failed to demonstrate how $72,300,000 financial loss from drainage and $50,500,000 damages from reduced viability of the wells were attributable to the GLO. Thus, Pearl has proven only $43,155,664 in damages ("*Pearl's Damages*").[137] Accordingly, Pearl has satisfied the fourth and final element of its breach of contract claim.

The Court will next consider the GLO's counterclaims.

## C.    The GLO's Amended Answer

---

[132] *See* ECF No. 270-1.
[133] *Id.*
[134] ECF No. 302; ECF No. 341; ECF No. 272-7 at 21-25.
[135] ECF No. 303 at 161.
[136] ECF No. 302; ECF No. 341; ECF No. 272-7 at 21-25.
[137] Pearl seeks drainage damages not only from Well 2021HA discussed supra, but also Well 2022HA which was granted a permit in May 2018. Like Well 2021HA, Pearl provided no evidence indicating why drilling besides initially spudding did not occur prior to the GLO's repudiation.

The GLO asserts two counterclaims against Pearl, to wit: (1) Breach of Contract; and (2) Trespass to Try Title.[138] The GLO bears the burden of proving these counterclaims.[139] The Court will address each in turn.

### 1. Breach of Contract

The GLO asserts that Pearl's failure to drill an offset well as required by paragraph 17 of the State Leases entitles the GLO to damages in the form of compensatory royalties.[140] For all the reasons discussed *supra*, the Court finds that the GLO has carried its burden to demonstrate that there was a valid contract, that the GLO had complied with its obligations prior to Pearl's alleged breach, and that Pearl breached its obligation.[141] As to the final element of damages, when a party commits a nonmaterial breach, the other party "is not excused from future performance but may sue for the damages caused by the breach."[142] This principle is consistent with settled Texas law regarding the elements of a contract claim; the claim requires a finding of breach, not a finding of material breach.[143]

The Court finds that the GLO satisfied its burden as to damages by demonstrating that the GLO lost $2,578,633 ("*GLO Damages*") worth of hydrocarbons drained by the Whiskey River Well from Section 20 due to Pearl's failure to drill an offset well.[144] Accordingly, the GLO has met its burden for its breach of contract counterclaim.

---

[138] ECF No. 127 at 13-15.
[139] *Fernandez v. Abita Springs Water Co.*, 2005 U.S. Dist. LEXIS 8361 (E.D. La. 2005) (Parties asserting cross-claims, counterclaims, and third-party claims have the burden of proving their claims by a preponderance of the evidence).
[140] ECF No. 127 at 13-14.
[141] *See generally* ECF No. 270-1.
[142] *Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 654 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).
[143] *See e.g.*, *Mays v. Pierce*, 203 S.W.3d 564, 575 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) ("A breach of contract occurs when a party fails or refuses to do something he has promised to do.").
[144] ECF No. 270-17 at 3, 12-13.

Nevertheless, Pearl asserts the following affirmative defenses to the GLO's Breach of Contract counterclaim, to wit: (1) impracticability; (2) repudiation; (3) discharge; (4) waiver; and (5) failure to mitigate.[145] Pearl has the burden to prove each of these affirmative defenses.[146]

As to impracticability, the Fifth Circuit teaches that the "rationale for the doctrine . . . is that the circumstance causing the breach has made performance so vitally different from what was anticipated that the contract cannot reasonably be thought to govern."[147] To the extent that it was impossible or otherwise impractical for Pearl to proceed in a diligent manner toward completion of a well, the GLO is not responsible for such delay, and Pearl could have sought a suspension for any circumstance outside its control pursuant to Texas Natural Resources Code section 52.301.[148] Pearl never attempted to seek such a suspension until far after its breach, in May 2020.[149] Accordingly, the Court finds that Pearl did not meet its burden as to impracticability.

"Repudiation" is defined as an "unconditional refusal to perform the contract in the future" and can be "expressed either before performance is due or after partial performance."[150] Pearl's obligations under paragraph 17 arose prior to the GLO filing the DTAD as discussed *supra*, and Pearl offers no other evidence of a repudiation. Accordingly, the Court finds that Pearl did not meets it burden as to repudiation.

As to discharge, waiver, and failure to mitigate, the Court finds that Pearl failed to provide any evidence as to these defenses and therefore denies them accordingly. The Court will next consider the GLO's Trespass to Try Title counterclaim.

## 2. Trespass to Try Title

---

[145] ECF No. 131.
[146] *See Gill v. St. Tammany Parish Hosp. Serv. Dist. No. 2*, 2018 U.S. Dist. LEXIS 243113 (E.D. La. 2018).
[147] *Eastern Airlines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 991 (5th Cir. 1976).
[148] *See* ECF No. 271 at 6-7.
[149] ECF No. 270-3.
[150] *Sci. Mach. & Welding, Inc. v. FlashParking, Inc.*, 641 S.W.3d 454, 462 (Tex. App.—Austin 2021, pet. denied).

The GLO's Trespass to Try Title claim is based solely on their position that the GLO has superior title to Pearl as to the Alleged Terminated Leases.[151] Nevertheless, the Court found *supra* that the Alleged Terminated Leases did not terminate by operation of law. Furthermore, the Court found *supra* that Pearl has superior title to the Alleged Terminated Leases. As such, the Court finds that the GLO has failed to satisfy its burden as to its Trespass to Try Title counterclaim. Accordingly, the GLO's Trespass to Try Title counterclaim is denied. The Court will next address the GLO's claim for attorney fees.

### D.      The GLO's Claim for Attorney Fees

The GLO seeks reasonable attorneys' fees under Texas Civil Practice and Remedies Code § 38.001.[152] Section 38.001(b) provides that reasonable attorneys' fees are permitted if the claim is for "an oral or written contract."[153] Because the GLO has met its burden to provide the State Leases constitute written contracts that Pearl has breached, the GLO is entitled to collect such fees.[154] Accordingly, the GLO is permitted to file an application for attorney's fees by no later than March 14, 2025, but only if such fees exceed Pearl's recovery. Pearl will have until April 4, 2025, to file an objection to the GLO's request for attorney's fees.

### E.      Sovereign Immunity

The sole issue remaining before the Court is whether the doctrine of sovereign immunity precludes Pearl's recovery. The GLO concedes that Pearl would be entitled to offset any damages it is ordered to pay the GLO with any amounts awarded against the GLO.[155] Pearl asserts however,

---

[151] *See* ECF No. 127 at 15.
[152] ECF No. 127
[153] TEX. CIV. PRAC. & REM. CODE § 38.001(b)(8).
[154] ECF No. 270-1.
[155] *See* ECF No. 305.

that the GLO waived sovereign immunity by consenting to this Court's jurisdiction and by conduct, and that Pearl is entitled to all of its damages.[156]

Sovereign immunity is a common-law doctrine that initially developed without any legislative or constitutional enactment.[157] Sovereign immunity encompasses immunity from suit, which bars a suit unless the state has consented, and immunity from liability, which protects the state from judgments even if it has consented to the suit.[158] The doctrine protects the solvency of states by providing immunity from lawsuits for money damages.[159]

As explained by the Fifth Circuit in *Meyers v. Texas*, the Supreme Court has unanimously held that "the Eleventh Amendment does not automatically destroy a federal court's jurisdiction over a claim; rather, it grants the state a legal power to assert a sovereign immunity defense, which it may raise or waive."[160] When a state initiates a lawsuit, it waives its sovereign immunity to the extent required for the lawsuit's complete determination.[161] However, that waiver does not affect or limit the State's ability to assert whatever rights, immunities or defenses are provided for by its own sovereign immunity law to defeat the claims against the State finally and on their merits in the federal courts.[162] Accordingly, to the extent that Pearl asserts that the GLO waived sovereign immunity on the basis of consent to this Court's jurisdiction, that argument is denied.[163]

---

[156] Courtroom Hearing – September 17, 2024 (Closing argument); *see also* ECF No. 365 at 20-27.

[157] *See Cohens v. Virginia*, 6 Wheat. 264, 19 U.S. 264, 293 (1821).

[158] *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999).

[159] *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002); *see also Alden v. Maine*, 527 U.S. 706, 750 (1999) (noting the important fiscal element to sovereign immunity and that "at the time of the founding, many of the States could have been forced into insolvency but for their immunity from private suits for money damages.").

[160] 410 F.3d 236, 245 (5th Cir. 2005) (quoting *Wisconsin Dep't Of Corrections v. Schacht*, 524 U.S. 381, 141 L. Ed. 2d 364, 118 S. Ct. 2047 (1998)).

[161] *Clark v. Barnard*, 108 U.S. 436, 448, 2 S. Ct. 878, 27 L. Ed. 780 (1883); *see also Meyers ex rel. Benzing v. Tex.*, 410 F.3d 236, 241 (5th Cir. 2005)("Generally, the Court will find a waiver either if (1) the state voluntarily invokes federal court jurisdiction, or (2) the state makes a 'clear declaration' that it intends to submit itself to federal court jurisdiction").

[162] *Meyers ex rel. Benzing v. Tex.*, 454 F.3d 503, 504 (5th Cir. 2006).

[163] *See e.g.*, *Stroud v. McIntosh*, 722 F.3d 1294, 1301-1303 (11th Cir. 2013) (adopting the Fifth Circuit's ruling in *Meyers* in an ADEA case to hold that "an arm of the state remains immune from liability . . . notwithstanding its

Alternatively, Pearl asserts that the GLO waived sovereign immunity by conduct.[164]

The Fifth Circuit has explained that filing a motion for summary judgment on the merits before raising Sovereign Immunity waives the assertion of sovereign immunity.[165] Other appellate courts have similarly held that sovereign immunity may be waived by conduct inconsistent with an intent to raise it-particularly delaying raising the issue.[166] Pearl asserts that this is precisely what the GLO did in this case; however, the Court finds that the GLO *did* raise sovereign immunity in its Motion for Summary Judgement. Specifically, the GLO moved for dismissal of certain affirmative defenses raised by Pearl because they could not be raised against a sovereign.[167] The Court even granted this relief on that basis in its "Memorandum Opinion & Order Granting in Part and Denying in Part Texas General Land Office's Motion for Summary Judgement."[168]

Accordingly, the Court finds that the GLO has not waived its sovereign immunity. Pearl's Damages of $43,155,664 is offset by the GLO's Damages of $2,578,633 for a total of $40,577,031. Pearl's recovery of this $40,577,031; however, is barred by sovereign immunity.

---

removal of the case" to federal court and attendant waiver of 11th Amendment immunity from suit in a federal forum); *Lombardo v. Pennsylvania, Dep't of Pub. Welfare*, 540 F.3d 190, 198 (3d Cir. 2008) (same); *Delaney v. Mississippi Dep't of Pub. Safety*, Civil Action No. 3:12CV229TSL-MTP, 2013 U.S. Dist. LEXIS 9600, 2013 WL 286365 at *3 (S.D. Miss. Jan. 24, 2013) (concluding that while removal resulted in waiver of Eleventh Amendment immunity from suit in federal court, the state retained its immunity from liability as to claims asserted under §§ 1981, 1983, 1985 and 1986).

[164] *See* ECF No. 365 at 23-24.

[165] *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 720 n.4 (5th Cir. 2004).

[166] *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1022 (9th Cir. 2010) (explaining "tactical delay 'undermines the integrity of the judicial system[,] . . . wastes judicial resources, burdens jurors and witnesses, and imposes substantial costs upon the litigants.'").

[167] ECF No. 153 at 26 ("Pearl cannot carry its burden because as recognized by the Texas Supreme Court, "the State in its sovereign capacity, unlike ordinary litigants, is not subject to the defenses of limitations, laches, or estoppel.").

[168] ECF No. 230 at 7.

## V.        CONCLUSION

A judgement consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

SIGNED February 28, 2025

Eduardo V. Rodriguez
Chief United States Bankruptcy Judge